**Frank R. and Bertha M. KRETCHMAR, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 51–84T.**

United States Claims Court.

Nov. 26, 1985.

Justin S. Holden, Providence, R.I., for plaintiffs.

Ellen C. Specker, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., for defendant.

## OPINION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

REGINALD W. GIBSON, Judge:

In this tax refund action, plaintiffs, Frank R. and Bertha M. Kretchmar, jointly seek a refund of federal income taxes, interest, and penalties in the amounts of $19,006.05, $27,404.64, and $24,250.02 for the taxable years 1976, 1977, and 1978, respectively. Plaintiffs claim that they were unlawfully assessed the foregoing additional amounts based upon an erroneous calculation of gross income for each of the years in question. Further, plaintiffs claim that the penalties assessed are without foundation in fact or in law.[1]

Without addressing the merits of these claims as to any of the foregoing years, defendant, in moving for summary judgment, avers that (1) plaintiffs' previous execution of IRS Form 870–AD,[2] Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and of Acceptance of Overassessment, now estops plaintiffs from seeking a refund for each of said taxable years; (2) for the taxable year 1978, plaintiffs have failed to pay in full the totally assessed amount for such year thereby depriving this court of subject matter jurisdiction to award a refund for that year; and (3) plaintiffs' failure, in this action, to reply to defendant's answer aver-

1. As to the penalties assessed pursuant to 26 U.S.C. § 6653(b) (1982), plaintiffs, in their response to defendant's motion for summary judgment, state merely that "[t]he Internal Revenue Service was wholly without grounds to assert penalties pursuant to *Internal Revenue Code of 1954*, § 6653(b)."

2. IRS Form 870–AD (appellate division), entitled "Offer of Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and of Acceptance of Overassessment," is the general purpose form which the IRS uses to register and memorialize settlement negotiations. The operative text embodying the substance of Form 870–AD is as follows:

This offer is subject to acceptance for the Commissioner of Internal Revenue. It shall take effect as a waiver of restrictions on the date it is accepted. Unless and until it is accepted, it shall have no force or effect.

If this offer is accepted for the Commissioner, *the case shall not be reopened* in the absence of fraud, malfeasance, concealment, or misrepresentation of material fact, an important mistake in mathematical calculation, or excessive tentative allowances of carrybacks provided by law; and *no claim for refund or credit shall be filed or prosecuted for the year(s) stated above other than for* amounts attributed to *carrybacks* provided by law.

Note.—The execution and filing of this offer will expedite the above adjustment of tax liability. This offer, when executed and timely submitted, will be considered a claim for refund for the above overassessment, as provided in Revenue Ruling 68–65, C.B. 1968–I, 555. It will not, however, constitute a closing agreement under Section 7121 of the Internal Revenue Code.

Exhibit C, Appendix B to the Memorandum for the United States in Support of its Motion for Summary Judgment, January 22, 1985 (emphasis added).

ring fraud regarding the filing of plaintiffs' returns for the years in question was an admission entitling defendant to judgment on the fraud issue as a matter of law. Because we find that plaintiffs failed to pay the amount (tax and penalty) fully assessed for the taxable year 1978, this court is without jurisdiction to entertain a claim for such year. As for the taxable years 1976 and 1977, we find that the plaintiffs are also barred from litigating the merits of their refund suit on the grounds that the doctrine of equitable estoppel, stemming from their previous execution of IRS Form 870–AD, is a complete impediment.[3]

## FACTS

Plaintiffs, husband and wife residing in West Brookfield, Massachusetts, filed timely federal income tax returns for the taxable years in question, 1976, 1977, and 1978. Schedule C of each of said returns described plaintiffs' business, euphemistically, as "novelty sales," and reported gross receipts and net income in the identical amounts of $11,700, $19,140, and $30,000, for the taxable years 1976, 1977, and 1978, respectively.[4] No deductible expenses were claimed as having been incurred in connection with earning these amounts of income.

During the calendar year 1980, Internal Revenue Agent (IRA) Robert B. Puzzo conducted an audit of the plaintiffs' 1976, 1977, and 1978 returns. That audit report (December 12, 1980) resulted in plaintiffs being assessed income tax deficiencies of $12,156.76, $13,867.49, and $24,180.99, for the taxable years 1976, 1977, and 1978,

respectively. In addition, plaintiffs were also assessed civil fraud penalties at the rate of 50% of the assessed tax deficiency plus deficiency interest ($6,078.39, $6,933.75, and $12,090.49 as to each respective tax year, pursuant to 26 U.S.C. § 6653(b)). In the aggregate, said audit generated a proposed assessment against plaintiffs in the amount of $75,307.89 in additional taxes and penalties. Said amounts were assessed within the periods prescribed by I.R.C. §§ 6501(a) and (c)(4), i.e., within three years from the date the returns were filed or within the period agreed to by voluntary extensions. Following the audit, a deficiency notice and offer of settlement, Form 870, was forwarded to the plaintiffs.

Plaintiffs rejected, i.e., refused to execute, the Form 870 settlement offer and appealed the foregoing proposed deficiencies to the Appeals Office of the Internal Revenue Service (IRS). Upon further settlement negotiation, the IRS agreed in 1982 to decrease plaintiffs' assessed gross income by the amount of $6,000 for 1976, and $20,000 for 1978. No adjustment, however, was made for 1977 given the agreed diminution in 1976 and 1978. As a result of said readjustments by the Appeals Office, plaintiffs' reassessed taxes and penalties were reduced to $14,063.52, $20,801.24, and $20,104.15, for the three taxable years in question or an aggregate amount of $54,-968.91. As evidence of the results of the compromise/settlement negotiations, and in order to preclude future assessments against such taxable years, plaintiffs executed Form 870–AD on January 29, 1982, which was accepted for the Commissioner

---

**3.** We do not reach the question of fraud as averred by defendant and/or allegedly admitted by plaintiffs because that issue goes to the merits of the refund claim. This is so since here we will dispose of this case by the application of the doctrine of equitable estoppel and a jurisdictional bar as to the claim regarding the 1978 return, *infra.*

**4.** "Euphemistically" is the appropriate adjective given subsequent revelations as to the real source of the understated income. From the documentation reflected in defendant's exhibits, it appears that on January 18, 1978, the Massachusetts State Police conducted a raid on plain-

tiffs' residence at which time $50,000 in cash was confiscated. A five-count indictment relating to illegal gambling activity followed therefrom, and plaintiff, Frank Kretchmar, pleaded guilty to each count. The Service, therefore, contends that given the fact that no income from the admitted gambling activities was listed on either of the 1976, 1977 or 1978 returns, the subsequently discovered unreported cash must have emanated from said illegal activity. *See* Exhibit F, Appendix to Reply Memorandum for the United States in Support of its Motion for Summary Judgment, March 7, 1985.

of Internal Revenue on February 9, 1982. *See* Exhibits B and C, Appendix B, Memorandum for the United States dated January 22, 1985.

Shortly thereafter, *i.e.*, on or about March 15, 1982, plaintiffs received the IRS notice that the agreed to deficiency had been accepted by the defendant. That notice also contained an assessment issued in the total amounts of $18,163.20, $25,922.91, and $24,250.02 for the taxable years 1976, 1977, and 1978, respectively, which included taxes, penalties, and deficiency interest. Plaintiffs' complaint alleges that the total foregoing assessment was in fact paid in full for *all* of the foregoing years in question over the period June, 1982 through February, 1983. The facts, however, belie this averment and show that the *total* assessment for the taxable year 1978 was *not* paid in full as of February 3, 1984, *i.e.*, the date plaintiffs' petition was filed in this court. Plaintiffs have since conceded the fact that payment in full has *not* been made for the taxable year 1978.[5] As for the taxable years 1976 and 1977, the Service's records confirm the jurisdictional fact that plaintiffs have paid in full the agreed to amounts assessed on Form 870–AD for such years.

In spite of plaintiffs' promise in the Form 870–AD that "no [future] claim for refund or credit shall be filed … other than for amounts attributed to carrybacks" for the years in issue after the execution of the Form 870–AD, they nevertheless filed a timely claim for refund (Form 1040X), for each of the years in question, "other than for amounts attributed to carrybacks" with the Boston Appeals Office of the IRS on or about May 23, 1983. At that date, despite plaintiffs' previous execution of several forms extending *the general three-year limitations period* for deficiency assessment for 1976 and 1977 to December 31, 1982, defendant's right to assess any further deficiency as to *all* years under the general three-year period of limitations

(§§ 6501(a) and (c)(4)) had then expired. On each such Forms 1040X, plaintiffs claimed, *inter alia*, that the originally reported income amounts on their returns for each year were correct; that the Form 870–AD was executed by a representative of plaintiffs who was acting outside the scope of his authority; that the Form 870–AD was itself illegal as it was executed beyond the three year statute of limitations contained in 26 U.S.C. § 6501; and that no grounds existed to assess civil fraud penalties pursuant to 26 U.S.C. § 6653(b). The IRS rejected plaintiffs' contentions and disallowed all of plaintiffs' refund claims on December 12, 1983.

Plaintiffs, thereafter, commenced a refund action in this court on February 3, 1984. The petition here did not seek refunds "for amounts attributed to carrybacks," but rather requested refunds of the same amounts for each year which were sought in plaintiffs' earlier appeal to the Appeals Office dated May 23, 1983. In opposition, on January 22, 1985, defendant moved for summary judgment in which it invoked the doctrine of equitable estoppel for all years as a result of plaintiffs' execution of Form 870–AD, and also averred that this court lacks jurisdiction with regard to the claim respecting the taxable year 1978.

For reasons hereinafter delineated, we find that judgment should be granted in favor of defendant on its motion for summary judgment as to all taxable years in issue.

## DISCUSSION

In passing on the operative issues for each taxable year, the court will address the claim regarding the taxable year 1978 first inasmuch as a jurisdictional bar is raised to the prosecution of that refund claim. Thereafter, we will discuss the impediment to the prosecution of the 1976 and 1977 refund claims because of the applicability of the doctrine of equitable estoppel.

---

**5.** *See* Plaintiffs' Response to Motion of the United States for Summary Judgment, February 8, 1985, at 11.

### A. *Jurisdiction Re 1978 Claim for Refund*

As a jurisdictional prerequisite, it has long been settled law that federal courts may *not* adjudicate tax refund suits for a given year until and *after* the deficiency assessed for that year has been paid *in full*. *Flora v. United States*, 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958), *aff'd on rehearing*, 362 U.S. 145, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). That holding has consistently obtained in both the Claims Court, and in the predecessor Court of Claims. *Tonasket v. United States*, 218 Ct.Cl. 709, 711–12, 590 F.2d 343 (1978); *Frise v. United States*, 5 Cl.Ct. 488, 490 (1984); *see also* 28 U.S.C. § 1491 (1982).

▆ For the taxable years 1976 and 1977, defendant has made no challenge to this court's subject matter jurisdiction over plaintiffs' refund action. IRS records submitted by the defendant confirm that all taxes, interest, and penalties agreed to through the execution of settlement Form 870–AD have been paid in full for the taxable years 1976 and 1977.[6] Premised on the standards articulated in *Flora* and *Tonasket, supra*, since plaintiffs have paid in full all deficiencies assessed for the taxable years 1976 and 1977, tax refund jurisdiction in this court, as to those two years, is proper.

▆ On the other hand, for the taxable year 1978, defendant has challenged this court's subject matter jurisdiction over plaintiffs' refund claim. Defendant alleges that for that taxable year, plaintiffs have made only two payments, aggregating $3,500, toward the total $24,250.02 deficiency agreed to on Form 870–AD.[7] Consequently, even after applying the modest overpayments from the 1976 and 1977 assessments to the outstanding 1978 balance, plaintiffs are left with a current unpaid balance of $18,425.44 in taxes, penalties,

and interest for the taxable year 1978.[8] There is no question as to the fact of failure to pay in full, as contended by defendant, inasmuch as plaintiffs in their opposition to defendant's motion for summary judgment candidly concede as follows: "Plaintiffs reluctantly agree that the [d]efendant is correct on this issue."[9]

In addressing this identical issue, the predecessor Court of Claims stated in *Tonasket v. United States* that:

> ... the jurisdictional basis for refund suits provides a second, independent ground for concluding that this court lacks jurisdiction. Section 1346(a)(1) gives the district courts concurrent jurisdiction with this court over actions to recover any internal-revenue tax, any penalty, or any sum erroneously or unlawfully collected. In *Flora v. United States*, 362 U.S. 145 [80 S.Ct. 630, 4 L.Ed.2d 623] (1960), the Supreme Court, after full consideration on reargument, affirmed its earlier construction of section 1346(a)(1) *as requiring full payment of all taxes or penalties before jurisdiction vested in the district courts.* 362 U.S. 146–47, 177 [80 S.Ct. 630, 631, 647, 4 L.Ed.2d 623]. Plaintiffs seek to avoid the full payment requirement by arguing that *Flora* does not apply to refund suits in the Court of Claims [now the U.S. Claims Court], or that *Flora* should be reconsidered on the basis of subsequent Supreme Court equal protection cases which plaintiffs interpret as making the *Flora* rule an unconstitutional discrimination against indigents. *We cannot construe Flora to preclude part-payment tax suits in district courts, but allowing such part-payment actions here.* Although the precise holding of *Flora* requires full payment before tax suits in district courts, the *ratio decidendi* of that rul-

---

6. *See* Exhibits D, E and F, Appendix B to the Memorandum for the United States in Support of its Motion for Summary Judgment, January 22, 1985.

7. *See* Exhibit F, Appendix B, *supra* note 6.

8. *See Id.* The overpayment credits amounted to $2,324.58.

9. *See* Plaintiff's Response to Motion of the United States for Summary Judgment, February 8, 1985, at 11.

ing—that full payment before suit is necessary to preserve the harmony of a carefully structured tax litigation system, *id* at 176–77—[80 S.Ct. at 646–47] *must extend to require full payment before suit in the Court of Claims.* *Tonasket,* 218 Ct.Cl. at 711–12 (emphasis added). Given the foregoing, this court is constrained to conclude, and must hold, that it lacks subject matter jurisdiction over plaintiffs' 1978 refund claim.

## B. *Equitable Estoppel*

### 1. *Background*

Defendant has next moved for summary judgment on plaintiffs' refund claims (the taxable years 1976–1977) on the ground that their previous execution of IRS Form 870–AD equitably estops plaintiffs from litigating these now compromised and settled claims. In short, defendant avers that it would be most inequitable and unjust, in the face of the bargained-for-concessions implicit in Form 870–AD signed by plaintiffs on January 29, 1982, and approved by defendant on February 9, 1982, to permit plaintiffs to file an efficacious claim for refund (May 23, 1983) long after the running of the general three-year statute of limitations (26 U.S.C. § 6501(a)) on additional assessments. Conversely, and in opposition, plaintiffs argue that (1) any estoppel of their claims would be "inequitable" given the fact that no compromise of their claims was made through the execution of Form 870–AD; (2) no prejudice would be visited on defendant should the agreement be revoked inasmuch as the statute had not run on additional assessments at the time plaintiffs filed their claims to the extent

the defendant can prove either fraud or an omission in excess of 25 percent of the amount of gross income originally reported; (3) in fact the Form 870–AD was executed by an unauthorized person; and (4) the Form 870–AD is not valid because the statute of limitations (§ 6501(a)) expired *prior* to January 29, 1982.

Research discloses that the application of the doctrine of equitable estoppel, to bar the prosecution of tax refund claims settled and concluded by the execution of a Form 870–AD, has provoked not only controversy but outright inconsistency among various federal circuits. On the one hand, there are those courts which strictly hold, according to the Supreme Court in *Botany Worsted Mills v. United States,* 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379 (1929), that the only binding form of tax settlement is one which conforms to the finality prescribed through a settlement agreement pursuant to 26 U.S.C. § 7121 (1982).[10] The justification for this conclusion is apparently premised on the fact that Form 870–AD specifically states that it is not such an agreement.[11] Absent strict adherence to the formality envisioned in § 7121, these courts, therefore, reject the application of the doctrine of equitable estoppel relying instead on the Supreme Court's admonishment that "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode." *Botany,* 278 U.S. at 289, 49 S.Ct. at 132. *Cf. Uinta Livestock Corp. v. United States,* 355 F.2d 761 (10th Cir.1966); *Associated Mutuals, Inc. v. Delaney,* 176 F.2d 179, 181 n. 1 (1st

---

**10.** 26 U.S.C. § 7121 (1982) states:

(a) Authorization.—The Secretary or his delegate is authorized to enter into an agreement in writing with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect to any internal revenue tax for any taxable period.

(b) Finality.—If such agreement is approved by the Secretary or his delegate (within such time as may be stated in such agreement, or later agreed to) such agreement shall be final and conclusive, and, except upon a showing of fraud or malfeasance, or misrepresentation of a material fact—

(1) the case shall not be reopened as to the matters agreed upon or the agreement modified by any officer, employee, or agent of the United States, and

(2) in any suit, action, or proceeding, such agreement, or any determination, assessment, collection, payment, abatement, refund, or credit made in accordance therewith, shall not be annulled, modified, set aside, or disregarded.

**11.** *See supra* note 2.

Cir.1949); and *Bank of New York v. United States,* 170 F.2d 20 (3d Cir.1948).

On the other hand, there are also those courts which have a tradition of affirmatively applying the doctrine of equitable estoppel to bar the litigation of claims previously concluded through the taxpayer's execution of a settlement Form 870–AD. These courts, *infra,* in essence, acknowledge the continued vitality of *Botany,* but they persuasively distinguish its holding by arguing that that case did not present the estoppel issue squarely to the Court. In support of this position, they refer to the following often cited *dicta* in *Botany,* to wit:

It is plain that no compromise is authorized by this statute which is not assented to by the Secretary of the Treasury. For this reason, if for no other, the informal agreement made in this case did not constitute a settlement which in itself was binding upon the Government or the Mills. *And, without determining whether such an agreement, though not binding in itself, may when executed become, under some circumstances, binding on the parties by estoppel, it suffices to say that here the findings disclose no adequate ground for any claim of estoppel by the United States.*

*Botany,* 278 U.S. at 289, 49 S.Ct. at 132 (emphasis added, citations omitted). Since the Supreme Court has expressly reserved the issue of what circumstances might ultimately raise the execution of a Form 870–AD to a binding settlement, certain courts have consequently held that *Botany* does not estop the courts from developing their own law on the subject. Thus, it is on the foregoing premises that a *properly executed* Form 870–AD has become a recognized impediment, in certain circuits, to estop taxpayers from litigating the merits of tax refund claims settled therein. *Cf. Stair v. United States,* 516 F.2d 560 (2d Cir.1975); *General Split Corp. v. United States,* 500 F.2d 998 (7th Cir.1974); *Quig-*

ley *v. Internal Revenue Service,* 289 F.2d 878 (D.C.Cir.1960); *Cain v. United States,* 255 F.2d 193 (8th Cir.1958); *Daugette v. Patterson,* 250 F.2d 753 (5th Cir.1957), cert. denied, 356 U.S. 902, 78 S.Ct. 561, 2 L.Ed.2d 580 (1958); *Monge v. Smyth,* 229 F.2d 361 (9th Cir.1956), *appeal dismissed per curiam,* 351 U.S. 976, 76 S.Ct. 1055, 100 L.Ed. 1493 (1956); *Elbo Coals, Inc. v. United States,* 763 F.2d 818 (6th Cir.1985).

2. *Equitable Estoppel in the Predecessor Court of Claims*

Research further discloses that the predecessor Court of Claims saw fit on a number of occasions to apply the doctrine of equitable estoppel on facts arising out of a taxpayer's previous execution of a Form 870–AD. *See Guggenheim v. United States,* 111 Ct.U. 165, 77 F.Supp. 186 (1948); *H.W. Nelson Co., Inc. v. United States,* 158 Ct.Cl. 629, 308 F.2d 950 (1962); *D.D.I., Inc. v. United States,* 199 Ct.Cl. 380, 467 F.2d 497 (1972); *McGraw-Hill, Inc. v. United States,* 224 Ct.Cl. 354, 623 F.2d 700 (1980) (doctrine affirmed but not applied on the specific facts of the case). In so doing, said Court of Claims made particular mention of the language cited from *Botany, supra.* For example, in the seminal case adopting the doctrine in the predecessor Court of Claims, *Guggenheim v. United States,* all of the formalities required for executing an efficacious Form 870–AD [12] were present. *Guggenheim,* 77 F.Supp. at 196. Both parties had signed, and the form was properly accepted by the Commissioner on the same day. *Id.* at 194. There, the court noted in contradistinction to *Botany* that:

Many of the elements in the formal agreement involved in this case [*Guggenheim* ] were lacking in that case [*Botany* ]. Moreover, we do not understand that case to hold, as plaintiff contends, that under no circumstances will a closing agreement be held binding unless executed in accordance with Section [7121]....

---

**12.** While in *Guggenheim,* the executed agreement was contained in a Form 870, that form had been modified to mirror, in all material particulars, the operative language contained in the Form 870–AD at issue here.

*Guggenheim,* 77 F.Supp. at 196. Having effectively distinguished *Botany,* the Court of Claims in *Guggenheim* went on to dismiss the tax refund action therein holding that cause of action to be equitably barred due solely to the plaintiff's previous execution of Form 870. *Id.* at 197.

■ Against the foregoing background, it is underscored that our research has uncovered no cases in the Claims Court or the Court of Appeals for the Federal Circuit (CAFC) since their inception in 1982, which have applied the doctrine of equitable estoppel premised on a taxpayer's prior execution of a Form 870–AD. That doctrine, however, has nevertheless been affirmed in other fact situations evidencing a similar detrimental reliance by defendant arising out of a previous agreement resolving an area of contention between the parties. Thus, although there is a factual dichotomy between the case at bar and the cases cited, *infra,* we view such fact variances to reflect a distinction without a significant difference. *See e.g., Alpena Savings Bank v. United States,* 8 Cl.Ct. 249 (1985) (bank loan guarantee); *Estate of Piper v. United States,* 8 Cl.Ct. 243 (1985) (estate and gift tax refund); *Estate of German v. United States,* 7 Cl.Ct. 641 (1985) (estate tax refund); *Pacific Gas & Electric Co. v. United States,* 3 Cl.Ct. 329 (1983) (implied-in-fact contract). While research has failed to unearth relevant Claims Court and CAFC precedent in which a Form 870–AD was involved, those decisions in the predecessor Court of Claims applying the doctrine of equitable estoppel are sufficient authority for this court to invoke this equitable defense in an appropriate case such as here. This is so because the Claims Court is compelled to follow, as binding precedent, applicable rulings in the prede-

cessor Court of Claims. *See* RUSCC, General Order No. 1, October 7, 1982.[13]

### 3. *Application of the Doctrine—Equitable Estoppel*

As outlined above, we apply the doctrine of equitable estoppel to preclude the litigation of plaintiffs' claims as to the taxable years 1976 and 1977. (While we may refer to the taxable year 1978, we deem it to be unnecessary to discuss the applicability of said doctrine to the taxable year 1978, inasmuch as plaintiffs concede that this court is without subject matter jurisdiction with respect to said year.) The discussion which follows demonstrates that in accordance with Court of Claims precedent, plaintiffs did, by executing the Form 870–AD, waive their right to further litigate the 1976 and 1977 claims, so that to reopen them at this juncture would significantly prejudice the defendant. On such facts, we find that equity favors the enforcement of plaintiffs' agreement.

■ In general terms, binding precedent teaches that the doctrine of equitable estoppel, arising out of the execution of a Form 870–AD, may be applied to hold a taxpayer to his bargain if the following three criteria are established: (1) the execution of the Form 870–AD was the result of mutual concession or compromise; (2) there was a meeting of the minds that the claims be extinguished; and (3) that to allow the plaintiff to reopen the case would be prejudicial given the defendant's reliance on the extinguishment thereof. *Guggenheim,* 77 F.Supp. at 196; *H.W. Nelson Co.,* 308 F.2d at 956–59; *D.D.I., Inc.,* 467 F.2d at 500–01; *McGraw-Hill, Inc.,* 623 F.2d at 706. As the pleading of the doctrine raises an affirmative defense, the bur-

---

**13.** RUSCC, General Order No. 1, October 7, 1982, states, *inter alia:*

The United States Claims Court inherits substantially all of the jurisdiction, caseload and grand tradition of the United States Court of Claims. To assure continuity in carrying out the business of the court, and to promote the interests of justice and service to the public, it is ordered as follows:

(1) *All published decisions of the United States Court of Claims are accepted as binding precedent for the United States Claims Court,* unless and until modified by decisions of the United States Court of Appeals for the Federal Circuit or the United States Supreme Court. (emphasis added).

den is on the defendant to establish these criteria by the requisite quantum of proof.

### a. *Mutual Concession and Compromise*

With respect to the first criterion, mutual concession or compromise, the defendant's documentary evidence clearly establishes this fact for all taxable years with striking similarity to the facts in *Guggenheim*. In *Guggenheim*, the court stated in that connection that:

> Plaintiff protested the proposed disallowance and thereafter conferences were held with plaintiff's representatives. A further investigation was made by a revenue agent. As a result of these discussions, the representatives of the Commissioner agreed to recommend for allowance a deduction ... claimed by plaintiff. Plaintiff abandoned his contention that the other deductions claimed were allowable. The Commissioner's representative also agreed to make an adjustment in plaintiff's favor on account of certain dividends.

*Guggenheim*, 77 F.Supp. at 194. In the case at bar, plaintiffs similarly protested the audit report which initially assessed them some $75,307 in deficiencies (taxes and penalties) in December 1980 for all of the years in issue. Likewise, as in *Guggenheim*, a further investigation was held in which an IRS report was issued containing the following revelations:

> *Taxpayers, in an effort to close this case, propose that the Government accept in the year 1976 a reduction of $6,000 as representing a repayment of the loan to Ray Heck as outlined above. Taxpayers concede all adjustments in 1977. In 1978, it is proposed that the Government concede the inclusion of $13,661 deemed to have been for the purchase of JTC stock. In the year 1978, taxpayers also propose that an*

*amount of $6,339 be considered as cash on hand. It is recommended that this proposal of settlement be accepted as a reasonable conclusion to this case.*

Appeals Transmittal Memorandum and Supporting Statement, Feb. 12, 1982 (emphasis added).[14] This paraphrase of the ongoing dialogue between plaintiffs and defendant as contained in the referenced IRS report, evidencing the negotiations leading to the final adjustments which were then recorded on Form 870–AD, persuasively belies plaintiffs' assertion that "[t]he numbers placed on the Form 870–AD were not a compromise at all."[15] Indeed, as in *Guggenheim*, it is clear beyond cavil, and we so find, that plaintiffs' settlement, manifested by the execution of Form 870–AD in this case, was a bilateral process driven by mutual concession and compromise.

In support of our holding as to mutual concession and compromise, we also stress that plaintiffs' proof regarding their contrary assertion was thoroughly insufficient to raise, even by their contentions, a genuine issue of material fact. While we acknowledge plaintiffs' attempt to raise such genuine issues of material fact based on the holding in *Lignos v. United States*, 439 F.2d 1365 (2d Cir.1971), we find that case to be clearly distinguishable from the case at bar. In *Lignos*, the Second Circuit refused to affirm the district court's grant of summary judgment on the grounds of equitable estoppel because there *plaintiffs* had adduced sufficient proof to raise a *factual issue* regarding whether defendant had in truth "conceded" its position in arriving at the settlement recorded on the Form 870–AD. *Id.* The appellate court in *Lignos* reached this conclusion based upon plaintiff's *clear evidentiary* showing in the district court which included specific facts alleged through sworn affidavits. *Id.* In the case at bar, however, plaintiffs have neither apprised this court of any *specific*

---

**14.** Exhibit F, Appendix to Reply Memorandum for the United States in Support of its Motion for Summary Judgment, March 7, 1985, page A20.

**15.** *See* Plaintiff's Response to Motion of the United States for Summary Judgment, February 8, 1985, at 6. The court notes that plaintiffs failed to proffer any supporting documentary evidence to their bland self-serving denial of the existence of a mutual compromise.

*facts* illustrating that there exists genuine issues for trial, nor have they proffered an affidavit averring such. Because of the foregoing, plaintiffs are entitled to no comfort from *Lignos* particularly whereas here they have failed to comply with RUSCC 56(e). Rule 56(e) states that:

> When a motion for summary judgment is made ..., an adverse party may not rest upon the *mere allegations* or denials of his pleading, but ... *must set forth specific facts showing that there is a genuine issue for trial.* If he does not so respond, summary judgment, if appropriate, shall be entered against him.

RUSCC 56(e) (emphasis added). In essence, plaintiffs in the case at bar have done nothing more than rely on repeated, conclusory allegations that there was no compromise. Without more, such bland assertion(s) may not generate genuine issues of material fact, nor may they overcome the persuasive proof proffered by defendant.

### b. *Meeting of the Minds*

The second criterion cited above requires that, concomitantly, there must also be a meeting of the minds to the effect that the right to raise any prospective claims or to otherwise reopen the case, for such years, be extinguished (save exceptions not here relevant). In *Guggenheim*, the court added substance to the evaluation of this concept by examining two additional factors: (1) the parties' course of conduct; and (2) the express language adopted by the parties on the Form 870–AD. *Guggenheim*, 77 F.Supp. at 195. As to course of conduct, the court stated:

> The conclusion is inescapable from the evidence that there was a meeting of minds as to the final disposition of the case. When that occurred, the Commissioner recomputed plaintiff's tax liability and transmitted to plaintiff the settlement document wherein was set out a deficiency for each of the years. In transmitting that document to plaintiff

at that time, the Commissioner stated that he was accepting plaintiff's "proposal for settlement," and also referred to the document as an "agreement" when executed by plaintiff and approved on his behalf. In returning the document after execution, plaintiff likewise referred to it as an "agreement."

*Id.* at 195. In *Guggenheim*, at no time did either party objectively manifest a belief that what was being negotiated was anything less than a complete settlement for the taxable years in issue. While no correspondence similar to that in *Guggenheim* has been presented to the court in the case at bar, neither has any demonstrative evidence been submitted supporting plaintiffs' contention that a definitive settlement was *not* intended for all taxable years. In fact, on this issue the documentary evidence is thoroughly supportive of defendant's position, particularly when we examine defendant's Form 5278, Statement-Income Tax Changes, prepared by the Appeals Office of the IRS which contains a box plainly checked "settlement computation." [16] Similarly, in the Appeals Transmittal Memorandum and Supporting Statement, *supra*, the words "Proposal of Settlement" are used consistently throughout to characterize the nature of the procedural posture of plaintiffs' appeal.[17] While plaintiffs may, as an afterthought, *now* contend otherwise, the evidence is wanting and it strains credulity to contend that the lengthy and detailed negotiations, which led to the preparation and execution of Form 870–AD, were conducted with any purpose other than that they were aimed at a definitive settlement.

Moreover, in reviewing the undeniable language contained in the Form 870–AD together with other referenced evidence, *supra*, the ultimate intentions of the parties leave no room for doubt. This conclusion is compelled when one carefully reviews the Form 870–AD, wherein the following unambiguous statement appears directly above the plaintiffs' signatures:

---

**16.** Exhibit B, Appendix B, *supra* note 6.

**17.** Exhibit F, Appendix to Reply Memorandum, *supra* note 14.

*If this offer is accepted for the Commissioner, the case shall not be reopened* in the absence of fraud, malfeasance, concealment or misrepresentation of material fact, an important mistake in mathematical calculation, or excessive tentative allowances of carrybacks provided by law; *and no claim for refund or credit shall be filed or prosecuted for the year(s) stated above other than for amounts attributed to carrybacks provided by law.*

Appendix B to the Memorandum for the United States in Support of Its Motion for Summary Judgment, January 22, 1985, Exhibit C (emphasis added). Thus, by signing the Form 870–AD containing the referenced language, plaintiffs, in essence, waived all further rights to contest the assessment for the stated taxable years, save for the specific exception not present in this case.[18] While the Form 870–AD was drafted by the defendant, no ambiguity exists as to the clear import of the intendment of the parties, *i.e.,* each side *expressly* waived its right (with exceptions not pertinent here) to subsequently litigate the settlement contained therein. For this court to find otherwise, at this posture, would contravene and directly ignore the clearly exhibited objective manifestations of the signatories.

Confronted with practically identical language on the Form 870 [19] in *Guggenheim,* the Court of Claims there equally underscored its opinion regarding the degree of mutuality between the parties by stating:

> In language which we think is too clear to be misunderstood and which would be rendered meaningless if plaintiff's interpretation were to prevail, the agreement states: "If this proposal is accepted by or on behalf of the Commissioner, the case shall not be reopened nor shall any claim for refund be filed or prosecuted respecting the taxes for the years above stated, in the absence of

fraud, malfeasance, concealment or misrepresentation of material fact, or of an important mistake in mathematical calculations." There is no contention that there was any fraud, malfeasance, concealment, misrepresentation, or mistake in calculation. *How this could be interpreted other than to preclude plaintiff from filing a claim for refund or prosecuting this suit is difficult to understand.*

*Guggenheim,* 77 F.Supp. at 195 (emphasis added). Thus, on substantially identical facts as obtained in *Guggenheim,* we see no factual or legal basis to find other than that the parties manifested an unequivocal mutuality of intent to extinguish plaintiffs' claims.

### c. *Detrimental Reliance*

The third, and final, criterion defendant must establish to effect the application of the doctrine of equitable estoppel is that of detrimental reliance. In the precise context of this case, to meet this burden, the proof must show that defendant detrimentally relied upon plaintiffs' execution of the Form 870–AD in question. The degree of detrimental reliance sufficient to support the application of the doctrine of equitable estoppel has been characterized by the courts in various ways. In *McGraw-Hill,* for example, the court stated that "equitable estoppel [is to be applied] whenever the IRS cannot be placed in the same position it was when the agreement was executed" (emphasis added). *McGraw-Hill,* 623 F.2d at 706. More specifically, perhaps, is the definition given in *D.D.I.* wherein the court states that detrimental reliance is the result which obtains "where the statute of limitations has run on the collection of further deficiencies between the time an informal compromise agreement was executed and the time the refund claim was filed ...." *D.D.I.,* 467 F.2d at 500.

---

**18.** The specific exception is that a *taxpayer* may renounce a Form 870–AD and file a claim for refund or credit, for the stated year(s), "for amounts attributed to carrybacks provided by law."

**19.** *See supra* note 12.

Quite logically, the predecessor Court of Claims has also, by implication, suggested the necessity for the defendant's reliance to have been reasonable under the circumstances. In this regard, the key variable is the timing of the defendant's knowledge regarding the plaintiff's decision to change its position, *i.e.*, whether the repudiation of the Form 870–AD occurs at a time when the statute of limitations on assessment has expired. Or, on the other hand, the question is whether such knowledge preceded the running of the statute of limitations to the extent that the Service could be restored to the "same position," *i.e.*, by expeditiously effecting an additional assessment within the general three-year period of limitations (§ 6501(a)). The case of *Erickson v. United States*, 159 Ct.Cl. 202, 309 F.2d 760 (1962), is particularly instructive on this issue. In *Erickson*, the Court of Claims estopped the plaintiff from seeking a refund of deficiency interest made payable under a compromise agreement proposed by the taxpayer as a settlement of a claim being litigated in the Tax Court. The settlement agreement contained an award of interest, yet the Tax Court in ratifying the agreement, omitted the award of interest. In accordance with the written settlement agreement itself, the Commissioner collected the interest. In estopping plaintiff from suing for a refund of the interest, the Court of Claims commented on the reasonableness of the defendant's reliance as follows:

> Taxpayer tells us that his counsel orally indicated to representatives of the defendant in October 1958, before the Tax Court orders had become final, that he intended to sue for most of the interest assessed and not refunded. This, he says, was sufficient warning to the Government that his position had changed. *But such informal oral statements, even if strongly asserted, would not change the reliance which the Government had already placed on the prior written agreement and could rightfully continue to place, at least until the agreement was formally repudiated in writing.*

*Id.* at 764–65 (emphasis added). Consistent with the foregoing statement by the court in *Erickson*, we construe the quoted language of *D.D.I.*, cited *supra*, to mean that the cut-off date for the defendant to claim detrimental reliance is certainly the date the Form 870–AD is "formally repudiated in writing." Thus, the prejudice to defendant emanating from detrimental reliance because of the running of the three-year limitations period, must have accrued at the date just prior to the time the claim for refund was filed with the IRS, or just prior to the date when any other written notice of repudiation was served on defendant, whichever occurs first. For defendant to proceed in allowing the three-year statute to run, after having received such written notice of repudiation, would clearly not be reasonable, nor indicative of the requisite prejudice required to be *caused* by the plaintiff. In other words, equity will only estop a plaintiff based on that prejudice which is traceable to its *own* action or inaction, not for that which is self-imposed by the defendant.

Plaintiffs insist that at the time they repudiated the Form 870–AD and filed their refund claims with the Service on May 23, 1983 (as well as at the date plaintiffs' petition was filed here (February 3, 1984)), the defendant was in no worse position to assess further deficiencies than it was in at the date the Form 870–AD became effective (February 9, 1982). That is to say plaintiffs argue that defendant was then "in the same position it was when the agreement was executed," as contemplated in *D.D.I.*, *supra*, and it is, therefore, not barred from effecting additional assessments for taxable years 1976 and 1977 upon the proof of fraud (26 U.S.C. § 6501(c)(1)); nor would it be so barred upon proof of an omission of income in excess of 25 percent of reported gross income (26 U.S.C. § 6501(e)). Defendant, on the other hand, has strenuously insisted that due to the running of the general three-year statute of limitations on assessment on December 31, 1982 (26 U.S.C. § 6501(a)), and a concomitant shift in the

burden of proof relative to the necessity of proving fraud as a basis for assessing a *deficiency* for the taxable years 1976 and 1977, defendant was *not* in the *same* position on May 23, 1983, as it was in at the time the Form 870–AD was executed (*i.e.*, January 29, 1982 and February 9, 1982). As discussed below, we find that at the date on which defendant received notice of plaintiffs' repudiation of the Form 870–AD (May 23, 1983), defendant had previously sufficiently relied to its detriment on the Form 870–AD so as to support the application of equitable estoppel to plaintiffs' refund claims. Therefore, regarding the existence of this final element—detrimental reliance, we agree with defendant as to both taxable years 1976 and 1977.

The detriment which we find sufficient to support defendant's claim of estoppel is both traditional, as contemplated under the standards articulated by *Guggenheim* and *D.D.I.*, and unique to the peculiar facts of this case. Starting with an examination of the facts as of the critical date of notice, May 23, 1983, we note that at that date, the three-year statutory period (inclusive of plaintiffs' extensions) had clearly run for both taxable years 1976 and 1977. For each of these two years, plaintiffs' consent to an extension of the three-year statutory period on assessment was effective up to December 31, 1982. The three-year period of limitations on assessments as extended for each year, therefore, expired approximately five months *before* plaintiffs filed their May 23, 1983 claims with the IRS. Consequently, on these facts, we find the precise prejudice which is cited to by the court in both *D.D.I.* and *McGraw-Hill*. Defendant cannot be put back in the "same position" today (or at any time after December 31, 1982) as it held before the Form 870–AD was signed simply because the *general statute* of limitations on additional assessments (§ 6501(a)), extended by § 6501(c)(4), which had *not* then run on February 9, 1982, had in fact expired at the date plaintiffs' claims for refund were filed.

On the foregoing, we are convinced that the *Guggenheim* case is, therefore, dispositive of this issue because substantially the same facts present here gave rise to a finding of prejudice there by the Court of Claims. Citing *cf.* to the case of *R.H. Stearns Co. v. United States*, 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934), the predecessor court stated:

> At the time the agreement in this case was executed the statute had not run on the collection of further deficiencies, but when the claims for refund were filed the statute had run. It would obviously be inequitable to allow the plaintiff to renounce the agreement when the Commissioner cannot be placed in the same position he was when the agreement was executed. A clear case for the application of the doctrine of equitable estoppel exists and should be applied.

*Guggenheim*, 77 F.Supp. at 196. For the reasons discussed *infra*, and *contrary* to plaintiffs' assertions in the case at bar, it is to the running of the *general three-year statute of limitations* (where extended, of course, by § 6501(c)(4)), and *only* to that statute, that we must look to determine the existence of the necessary prejudice to the defendant.[20]

We now turn to distinguish those factors which plaintiffs contend effectively mitigate any prejudice to defendant in spite of the running of the three-year statute as extended.

Plaintiffs' first argue that there would be no prejudice to defendant upon a reopening of the deficiency assessment and considering their claims for refund because defendant continues to be free to assess additional income tax deficiencies upon proof of fraud (§ 6501(c)(1)). Section 6501(c)(1) provides, *inter alia*, that "[i]n the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed ... at any time." 26 U.S.C.

---

**20.** While the more substantive reasons for this conclusion are discussed *infra*, we think it important to note that in each of the cases cited throughout this opinion, *only* the three-year general statute was considered in relation to the finding of prejudice to the defendant.

§ 6501(c) (1982). Plaintiffs therefore conclude that because of § 6501(c)(1), taken together with defendant's ultimate burden to prove fraud for purposes of sustaining the fraud penalty, there is no impediment on the defendant to now assess any deficiency it was able to establish back when the Form 870–AD became effective on February 9, 1982. Because of that perceived circumstance, plaintiffs reason that a consideration of their claims for refund would therefore visit no prejudice on defendant as to any year. Plaintiffs' averment is based on the premise that given the fact that defendant had the burden of proof on the fraud penalty issue, upon the initial assessment back in 1980, and that that same burden would obtain in this court in any proceeding on the merits relating to additional income taxes assessed, then defendant is in no more difficult a position to assess its deficiency *now* than it was in when the Form 870–AD was executed.

In its forceful argument to the contrary, the defendant states that while the burden of proof *as to only the fraud penalty* has been defendant's throughout, upon the running of the three-year statute of limitations on assessments, proof of fraud now becomes the *only* method (with one exception, *infra*) to assess an additional deficiency for each year in issue. In other words, *before* the three-year statute (as extended to December 31, 1982 for 1976 and 1977, and April 15, 1982 for 1978) had run, defendant's burden was only to prove fraud sufficient to entitle it to assess the fraud penalties but proof of fraud was not *then* an imperative in order to effect a timely income tax assessment. *After* the general statute of limitations had run, however, in order to make additional tax assessments, defendant would have to first prove that the understatement was due to fraud in order to effect a valid assessment. In essence, the power to assess a deficiency before the general three-year limitations period had expired, with the benefit of the

presumptive correctness of the Commissioner's determination, would become *contingent* upon *defendant's* proof of fraud after the statutory three-year period had expired. Moreover, the benefit of the presumption would then be unavailable. This is the new burden which defendant claims is a resulting detriment.

Plaintiffs' attempt to rely on the § 6501(c)(1) fraud exception to claim that defendant is in as good a position *now* to assess a tax deficiency as it was in *prior* to the execution of the Form 870–AD, is clearly erroneous. Because the three-year statute has run as to all years, the power to make additional assessments for each year arises *only* upon an initial showing of fraud. This is obviously *not* the most favorable position defendant was in prior to the approval of the Form 870–AD early in 1982. At that time, defendant had *no* initial burden on the tax deficiency assessment (only on the fraud penalty). The initial burden to prove that the *tax* deficiency was in error was on the plaintiffs, *i.e.*, plaintiffs would have been required to overcome the presumptive correctness of the tax assessment although defendant would have had the burden on the fraud *penalty*. In such case, if defendant failed in its burden on the fraud penalty, the fraud penalty *only* would fall. Now, upon proceeding to assess under § 6501(c)(1), defendant would have the burden as to *both* the tax deficiency as well as the fraud penalty. And upon a failure to prove fraud, it would lose both the tax and the penalty. Thus, the precise prejudice which *still* persists even under an application of § 6501(c)(1) is that defendant, contrary to the situation under the general statute of limitations, is now statutorily required to prove that the tax deficiency is due to *fraud* prior to making additional assessments.

Secondly, plaintiffs' reliance on § 6501(e), which permits a *six*-year limitations period [21] for assessment based upon a

---

**21.** The six-year limitations period provided by § 6501(e) runs from the due date of the return. For the taxable year 1976, the six-year period on

assessments would run on April 15, 1983, and for 1977 it would run on April 15, 1984. Thus, additional tax assessments for taxable years

showing of a 25 percent understatement, relative to the taxpayer's originally reported gross income, is also ineffective to negate the prejudice to defendant based upon a running of the three-year statute. First, even assuming *arguendo* the six-year statute had not expired at the time plaintiffs' claims were filed with the IRS on May 23, 1983, prejudice to defendant would still exist based on defendant's burden to first establish the *applicability* of § 6501(e). In other words, defendant would have the affirmative burden to *prove* a 25 percent understatement in order to effect an assessment. We stress that *prior* to the running of the three-year statute, defendant would have had *no* such burden as was true on the date the 870–AD was executed. Thus, like the results under § 6501(c)(1) discussed *supra*, the power to assess a deficiency, after the three-year limitations period had expired, would become *contingent* upon defendant's initial proof of a 25 percent gross income understatement after the statutory three-year period had expired. We also view this added burden as the precise prejudice defendant would encounter, due to the running of the general three-year limitations period on assessments, if it proceeded under § 6501(e).

While it is clear that the six-year statute had *not* run for the taxable years 1977 and 1978 at the date plaintiffs filed their claims with the IRS (April 15, 1984/1985 vs. May 23, 1983), nevertheless, for the reasons expressed *infra*, we do not believe this fact in any way diminishes the *additional* prejudice which we find would be visited on defendant were such years reopened. This is due to the "package" nature of the particular settlement at bar which was derived from the *interdependent* concession and compromise of claims for *three* separate years. As discussed *supra*, for 1976 and 1978, defendant conceded significant amounts, previously charged as income, which were claimed to be otherwise by plaintiffs. In return for settling 1977, as

originally assessed, defendant conceded reductions in income for 1976 and 1978, and the resulting added burden of proof on defendant to affect an additional assessment, plaintiffs would have this court reopen this case for all years in order that plaintiffs might reverse their *own* concessions. Quite amazingly, plaintiffs assert this request based on a perception that to do so would result in *no* prejudice to defendant.

In response to plaintiffs' position, we believe that where the three-year limitation period has run as to even *one* year of a unified multi-year settlement, significant prejudice would result to defendant to allow a reopening of any included year whereas here said statute on assessment for that year has run. This is so because we do not view the "trade-offs" embodied in a multi-year Form 870–AD compromise to be reasonably and *unprejudicially* severable. Rather, such "trade-offs," in our view, are inextricably intertwined and contingent *across* all years in issue to the extent that, if the formula is involuntarily and/or unilaterally modified for any year, the benefit to one party may be transformed into a detriment to the other. For example, if the 1976 assessment were to stand—a year in which *defendant* conceded $6,000 in income—and 1977 were to be modified favorably to plaintiffs—a year in which *plaintiffs* conceded their position—the result would be that only defendant would be held to its Form 870–AD concession, while plaintiffs would have the benefit of renouncing their concession. Under such a scenario, plaintiffs would be guaranteed the benefit of their bargain, while the defendant would be deprived of its bargain.

This package concept, as applied to the facts of this case, finds sound support on somewhat different facts in the *D.D.I.* case cited *supra*. In *D.D.I.*, the Court of Claims applied equitable estoppel to bar a plaintiff's attempt to reopen several 870s en-

1976 under this statute could not be effected after April 15, 1983, because that statute ran *prior* to the date plaintiffs filed their claims for refund. Defendant was free to assess additional

taxes for 1977 and 1978 after plaintiffs' claims were filed (May 23, 1983) because § 6501(e) limitations on assessment did not run until April 15, 1984 and 1985 respectively.

tered into as part of a comprehensive package settlement which included the compromise of three pending lawsuits. After the Commissioner had agreed to dismiss the lawsuits, and had contingently agreed to execute 870s closing several other administrative claims on terms similar to those conceded in the lawsuits, the plaintiffs brought suit to reopen the aforementioned administrative settlements. Plaintiffs in *D.D.I.* relied, for reopening their Form 870s, on the doctrine of equitable recoupment claiming that in spite of the settlement on Form 870, and the running of the three-year statute, defendant still possessed a right to prove by offset and to recoup any amounts plaintiffs would be able to prove as refunds, and to that extent the reopening by plaintiff would not cause a detriment to defendant.

Plaintiffs cited for support the New York District Court case of *Morris White Fashions, Inc. v. United States,* 176 F.Supp. 760 (S.D.N.Y.1959), which had refused to apply equitable estoppel on summary judgment claiming it would first be necessary to determine whether equitable recoupment was available to the defendant. In distinguishing *Morris White,* the Court of Claims stated:

> However valid the reasoning of *Morris White* might be in a case concerning an informal compromise with a single taxpayer, *it is totally invalid when the compromise is a "package deal." Defendant, in this case, cannot open the cases of the litigating corporations even for use as set-offs.*

*D.D.I.,* 467 F.2d at 500 (emphasis added). While we do note the case at bar concerns a "single taxpayer," *i.e.,* married persons filing a single joint return, we nonetheless find the package concept, *i.e.,* multiple years, relevant based upon our belief that like *D.D.I.,* equitable recoupment very well might not be available to make defendant whole in this case. In *D.D.I.,* equitable recoupment was found to be unavailable because set-offs could not be had at law or in equity *among all of the different taxpayers* involved in the unified package settlement. In the case at bar, we find eq-

uitable recoupment equally unavailable as the plaintiffs' unified package settlement represented compromises *among different years* which if disturbed will divest defendant of its bargain. Under the doctrine of equitable recoupment, such compromises, embracing *different years,* cannot, we believe, be involuntarily revisited and offset against one another without a detriment to one of the parties. Only those compromises and refunds *within a single year* can be offset for purposes of equitable recoupment. In other words, you cannot now unscramble the eggs without a detriment inuring to the defendant. Like *D.D.I.,* then, the same legal and equitable limits on the doctrine of equitable recoupment which precluded its application there, are also present here. In neither *D.D.I.* nor the case at bar would equitable recoupment be available to offset the contingencies which *induced* defendant's specific compromises. Therefore, barring the application of equitable recoupment, we find the package doctrine as expressed in *D.D.I.,* *supra,* fully supports our interpretation of that doctrine for purposes of finding prejudice to defendant in the case at bar.

According to long-standing precedent, "[a]n action for refund of taxes is essentially governed by equitable principles." *Erickson,* 309 F.2d at 763 (and case cited therein). To this we add that to *get* equity, a party must *do* equity. The package nature of plaintiffs' settlement on Form 870–AD precludes an equitable result from obtaining if plaintiffs were permitted to reopen this case and prevail once the three-year statute has expired.

### 4. *Miscellaneous Claims*

Finally, we note that in their futile attempt to overcome defendant's plea of equitable estoppel, plaintiffs also proffer the contention that the Form 870–AD, as executed, was not authorized by the taxpayers. Plaintiffs also have contended that the Form 870–AD is not a valid assessment because it was executed after the § 6501(a) statute of limitations had expired.

We think the foregoing contentions are frivolous afterthoughts and, thus, are entitled to short-shrift. With respect to the initial point, the court notes that the taxpayers' names are subscribed to the Form 870–AD and that plaintiffs failed to submit an affidavit of a handwriting expert in corroboration of their apparent position that they did not sign said Form 870–AD. And with respect to the second point, *i.e.*, the 870–AD is void because the statute of limitations on assessments had run prior to its execution, our review of the submissions discloses that the unimpeached documentary evidence is to the contrary. This is so because Exhibits B, C, and D, Consent To Extend The Time Of Assess Tax (Form 872), contained in defendant's Appendix to Reply Memorandum dated March 7, 1985, collectively extended the statute of limitations on assessments for the years 1976 and 1977 to December 31, 1982. It is patently clear that the statute, as extended for 1976 and 1977, had not expired as to either year upon the execution of Form 870–AD (nor had it expired for 1978 since that cutoff date was April 15, 1982, and the 870–AD was executed prior to that date).

In the face of the foregoing unimpeachable documentary evidence, we are troubled as to the motivation underlying plaintiffs' contentions. Whatever their reasons might be to make such an argument, in spite of Exhibits B, C, and D, *supra*, this circumstance makes balancing the equities of this case in favor of the defendant less troublesome.

CONCLUSION

The foregoing outlines the various forms of prejudice inuring to defendant which we have found based upon the detailed facts as presented in this case. Since we have also found the requisite concession or compromise, and a meeting of the minds with regard to extinguishing of the claim, we see no legal basis for denying defendant's motion for summary judgment. In short, the following language in *Guggenheim* thoroughly summarizes our position:

A reasonable interpretation of the entire document is that what the parties sought to do was to close the case in such a manner that it could not be reopened either for a refund or for the assessment of deficiencies except in the case of fraud, malfeasance, etc. We see no reason for interpreting the document otherwise.

*Guggenheim*, 111 Ct.Cl. at 181, 77 F.Supp. 186. Defendant's motion for summary judgment is therefore granted (1) for the taxable year 1978 based on lack of subject matter jurisdiction and (2) for the taxable years 1976 and 1977 based on the doctrine of equitable estoppel. The Clerk shall dismiss the plaintiffs' petition.

IT IS SO ORDERED.